NATIONAL MINES CO. v. CHARLESTON HILL NAT. MINING SYNDICATE et al.

(District Court, D. Nevada. October 26, 1912.)

No. 1,185.

MINES AND MINERALS (§ 38*)—EXTRALATERAL RIGHTS.

In a suit to determine complainant's extralateral rights with reference to certain mining locations, evidence *held* to require a finding that the N. vein at its apex and on its strike traversed complainant's West Virginia location from end to end, crossing both end lines, dipping in a westerly direction, and in its downward course passed beyond the west side line of that claim and beneath the surface of complainant's Charles-

ton Fraction location to and across the west side line thereof, and continuing in its downward course passed beneath the surface of defendant's West Virginia No. 1 location and Charleston No. 1 and the West Virginia Fraction, and that complainant was therefore entitled to extralateral rights along the vein under such claims.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 87½–113; Dec. Dig. § 38.*]

In Equity. Suit by the National Mines Company against the Charleston Hill National Mining Syndicate, a corporation, and the Mammoth National Mines Company. Judgment for complainant.

Dickson & Ellis, of Salt Lake City, Utah, L. G. Campbell, of Winnemucca, Nev., Bartlett & Thatcher, of Tonopah, Nev., and E. S. McCord, of Seattle, Wash., for complainant.

Rufus C. Thayer and Metson, Drew & MacKenzie, all of San Francisco, Cal., for defendant Mammoth Nat. Mines Co

FARRINGTON, District Judge. This action was originally brought against the Charleston Hill National Mining Syndicate and the Mammoth National Mines Company. The Mammoth has defaulted; hence, wherever the term "defendant" is used in this opinion, it will be understood as referring to the Charleston Hill National Mining Syndicate alone.

Complainant owns the West Virginia, the Charleston, and the Charleston Fraction. Defendant owns the West Virginia No. 1 and the Charleston No. 1. The West Virginia Fraction lies between the West Virginia and the West Virginia No. 1; otherwise it is of no interest in this suit. The six claims are located about north 33° west, and occupy a tract of land some 2,904 feet long, varying from 1,100 to a little more than 1,200 feet in width. The West Virginia and the Charleston, on the east side of the tract, are separated from the West Virginia No. 1 and the Charleston No. 1 on the west side by a strip of ground which has its greatest width, 39 feet, at the south end·of the tract, and extends to the north 1,840 feet. From that point the Charleston and the Charleston No. 1 have for 1,079.78 feet, and to the north end of the tract, a common side line. The Charleston Fraction occupies the north 1,088.8 feet of the strip, and the West Virginia Fraction the south 751.2 feet; the two claims have a common end line. The north end line of the West Virginia and the south end line of the Charleston are identical. The same is true of the north end line of the West Virginia No. 1 and the south end line of the Charleston No. 1. The properties are situated on the western slope of the mountains to the east of Quinn River Valley, in National Mining District, Humboldt county, Nev.

Valuable mineral in place was discovered first on the West Virginia No. 1. That claim was therefore the earliest valid location.

In the bill it is alleged that the National vein at its top or apex, and on its strike, traverses the West Virginia from end to end, crossing both end lines; that it dips in a westerly direction, and in its downward course passes beyond the west side line of that·claim, and beneath the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

surface of the Charleston Fraction, to and across the west side line thereof, and continuing in its downward course passes beneath the surface of the West Virginia No. 1, the Charleston No. 1, and the West Virginia Fraction.

The answer denies that there is any vein in the West Virginia, the top or apex of which lies wholly within the side lines of that claim; denies that there is any vein within the West Virginia which traverses that claim from end to end, or crosses both or either end line thereof; denies that said alleged vein in its downward course passes beyond the west side line of the West Virginia and beneath the surface of the Charleston Fraction, the West Virginia No. 1, or the Charleston No. 1; and denies that there is any vein, or any part of the apex of any vein, so situated with reference to the boundary lines of the West Virginia that any extralateral rights whatsoever can be lawfully predicated thereon. In brief, no extralateral rights attach to the ownership of the West Virginia, because the vein in its course crosses neither end line, and its apex is too broad to be wholly included within the side lines of that claim; and, finally, the vein in its downward course does not pass beneath the surface of defendant's properties.

On the trial defendant contended that the West Virginia is traversed by more than one vein; that the workings do not follow a continuous fissure; that the first, which will be termed the "National vein," after crossing the north end line of the West Virginia, proceeds on a course nearly due south more than one-third the length of that claim, and meets a second fissure, which will be termed "the fault," coming on a strike of about north 30° west, across and from the south end line; that the fault has a much flatter dip than the National vein; that, wherever the National vein has butted against the fault, it has been cut through and sheared off in such manner as to leave at the line of cut-off, and against the lower side of the plane of the fault, an underground apex.

The mountain side on which the claims are located falls away rapidly toward the north, so much so that it has been possible to work the mines through a series of tunnels following each other down the dip of the vein toward the west, like steps. Between the portal of tunnel No. 5 and its south face, which is 600 feet beneath the surface, the distance in a straight line is less than 1,300 feet. Station 575 at the south end of the apex drift, 142 in tunnel No. 2, 146 in tunnel No. 3, 118 in tunnel No. 3½, 115 in tunnel No. 4, and 172 in the west drift of Mammoth No. 3 tunnel, fix approximately the line along which the National vein is bent or cut off as it descends into the earth. This line will be termed the "break."

If the dip and strike of the two fissures were constant, the contact would be a straight line to the deep. As it is, that line conforms to the convexities, concavities, and bends of the vein along its way. The upper end of this line, at station 575, near the surface is 574.6 feet from a vertical plane passing through the south end line of the West Virginia; it crosses under the east side line of the West Virginia No. 1 at a point near station 118 on the 3½ level, 572 feet from said plane, and at vertical depth of about 350 feet. The horizontal distance thus

covered by the vein on its dip between the two stations is more than 275 feet. Station 118 is some 4 or 5 feet within the exterior lines of defendant's property. From station 575 to station 118, the line of cut-off is substantially parallel to the end lines. From station 118 to a point between the top of the Workman Raise and the floor of level 3½, through which it must pass if there be such a cut-off, it is nearly parallel to the side line; approximately, the two arms form a right angle. The top of the Workman Raise is 108 feet south of station 118. If the west drift on the 3½ level be extended on its present course 25 feet to the south, it will be directly above the top of the Workman Raise. If the Workman Raise be continued upward on its present course, it will cut the east drift on the 3½ level a few feet south of station 132. Unfortunately the Workman Raise has not been connected with the 3½ level; consequently it is impossible, conceding the existence of the cut-off, to determine its precise location within the 40 feet of vertical space which separates the raise from the level. Mr. Boyle places it 10 feet above the Raise. In any event, if there be a line of cut-off, for 108 feet south of station 118 to a point 10 feet above the Workman Raise it is nearly level, and within defendant's side lines.

It is clear, and it is conceded, that complainant is entitled to extralateral rights between parallel vertical planes, one drawn through the south end line of the West Virginia, and the other through a point on the west side line of that claim 572 feet from its northwest corner. That portion of the National vein which is in dispute lies south of both planes.

The questions to be decided are: Was the National vein sheared off by the fault; if so, is the underground apex of the vein within complainant's lines, or within defendant's lines?

These questions cannot be decided on the ground that witnesses are unworthy of belief. The only basis on which a fair decision can rest is on facts which have been established by the evidence. Undoubtedly future development will fix as existent or nonexistent much which is now inference, more or less well taken, and about which, in my opinion, the experts sincerely and honestly disagree.

The strongest possible evidence that the vein has been sheared off would be the severed fragment. If the cutting were followed by moderate or no displacement, complainant's extralateral rights might not be disturbed. In any event, they cannot be affected in so far as the original apex remains within the West Virginia side lines. The severed segment, if it ever existed, has disappeared; its disappearance is accounted for by defendant in this way: The mountain on which the West Virginia is located was built up by successive lava flows; the earlier lavas were largely rhyolitic or acid, and in them the National vein was formed. In the later flows of basalt, obsidian, and rhyolite, the basic rock predominated; the later outpourings of lava did not take place, and the fault fissure was not created, until after the National vein had been formed and mineralized, substantially as it is to-day. The fault fracture cut through the younger series of lavas, and that portion to the west of the fracture settled down, until the

lower strata—that is, the dark colored basalt of the later lava flows in the hanging wall—was abreast the lighter colored rhyolite in the foot wall. Thus the severed portion of the vein was carried to the deep, where it now rests in the hanging wall country somewhere to the west of the fault. This displacement must have exceeded 300 feet, because no trace of the missing vein has been found in Mammoth No. 2 tunnel, which explores the country for 76 feet west of No. 3 level at a depth of at least 320 feet. Defendant's experts estimate this displacement at 600 vertical feet. Measurements at the saddle, between Buckskin Mountain and Charleston Hill, some 3,000 feet south of the ground in question, tend to show a faulting at that point, followed by a vertical displacement of 600 feet. Conceding the extensive displacement at the saddle, and the identity of the fracture at that point, and the fault fissure in the West Virginia, still it does not necessarily follow that the downward movement will be the same at both points or at all points along the fissure. It is impossible to assume that the hanging wall country settled uniformly, as one unbroken solid mass; it was composed of rock varying in strength and texture, and in the fracture itself there were bends and irregularities which accelerated or retarded the movement. It is also reasonable to suppose that the conditions which led to the fracture, and permitted the downthrow, were more quickly satisfied at one point than at another.

However this may be, whether there were one or two fissures, whether the disturbed conditions at and along the line of break were the result of the severing of one fissure by the other, or simply because there was a bend in the original fracture, it is certain that the hanging wall country relative to the foot wall subsided. This is shown by the striations or slickensides on the walls, and the drag, or rounded and worn fragments of rock at various places in the workings, and also by the veins themselves. The National vein, as well as the fault, is a fissure which originated as a fracture, caused possibly by the contraction and settling of the more porous lavas to the west. Each fissure pursued a more or less regular and uniform course along its strike, and into the deep, save as it was otherwise directed by the nature of the rock through which it passed, and by the forces to which it owed its creation. At first the walls were touching each other, then the hanging wall dropped, possibly the displacement was sudden, but of moderate amount, and recurrent. This movement, with the inevitable sliding, grinding, and crushing of one surface against the other, produced a zone of broken rock, and more fully divided and pulverized material, which is now either gouge or clay. The fissure, once formed, permitted the circulation of surface and subterranean waters laden with mineral.

The defense is based not only on the theory that the National vein and the fault are distinct fissures, but that the former was made and mineralized before the latter came into existence. The evidence shows the two fissures are of equal width. There is more quartz and less clay and gouge in the vein than in the fault. Possibly the presence of so much clay in the fault, impeding, as it naturally would, the flow of waters carrying mineral, will account in part for the difference in the

mineralization of the two fissures, and the relatively small quantity of quartz in the fault. Unquestionably there are marked differences in the filling of the fault and the National vein. In this, however, there is nothing unusual. It rarely occurs that any vein containing gold and silver has been uniformly mineralized, or equally enriched throughout its entire length and depth, or even throughout any considerable space. In the National vein there are spots of extraordinary enrichment, where the ore has a value of $60 or $70 a pound; nevertheless even in this portion of the mine the volume of ore taken from the vein is trifling as compared with the waste which is broken down.

In support of the theory that the National vein was formed before, and the fault after the younger series of flows, defendant has shown that the foot walls, both of the vein and of the fault, both north and south of the break, are rhyolitic; that the hanging wall 'of the National vein north of the break, and both walls of tunnel No. 4 south of the break, are of the same character; that the country rock between the east and west branch of the loop on level No. 3, between the east and west drift on the 3½ level south of the break, and between the east and west drift on Mammoth No. 3, also south of the line of break, is rhyolitic; and that the hanging wall country of the fault is basalt, or basic rock. In brief, the younger basalt forms the hanging wall of the fault; elsewhere the country rock is of the older series. It is argued that, if there is none of the younger basalt in the hanging wall of the National vein, the vein must have been formed, and the downthrow of its hanging wall must have occurred, before the younger basalt came out. If the hanging wall of the fault is of the younger basalt, the fault must have been created after the later series of lavas flowed over the earlier rhyolitic rock in which the National vein had been formed.

The country rock exposed in the workings of the mine is susceptible of further classification, which suggests an entirely different explanation. There is no testimony which I recall of any basic rock north of the break, except in crosscut No. 6 from Mammoth No. 2 tunnel; that crosscut is more than 80 feet long, and less than half its length is north of the line of break. There is no evidence of any basic rock in Mammoth No. 3 tunnel, except in the west drift south of the break. In brief, practically all the basaltic hanging walls are south of the line of break, and all the walls north of that line are rhyolitic.

Prof. Lawson testifies that the younger series of lavas coming from the south stop on the surface of the claim in the vicinity of defendant's cross-section 9–9; that is, about 250 feet south of station 575, and 140 feet south of station 118.

Mr. Wiley says:

"The basalt does not extend down to the center of the West Virginia. It covers the southwest corner of the West Virginia, and for a distance of 500 or 600 feet north of the south end line."

If the fault and the vein were contemporaneous, and were created after all the lava flows, it would not be unreasonable to expect basic rock in the hanging walls south of the break under the basic rock at' the surface, and acid rock in the hanging walls north of the break,

where the overlying rock to the surface is almost entirely rhyolite. It is true there are few places south of the break where the hanging wall of the fault is exposed, and practically none where it is opened by crosscuts. In support of defendant's theory, I am not at liberty to assume that, if exposures and crosscuts were made, basic rock would be discovered.

Complainant's testimony is to the effect that the heavy, tough, black gouge, which is claimed to be characteristic of the fault, and which is probably the product of the dark basic rock, is found in the east drift on Mammoth No. 3 level, and also in No. 4. This testimony is not altogether in harmony with the theory that both those drifts are run in acid rock. However, it is unnecessary for the purposes of this case to decide which is correct. The only exposure of what is conceded to be the National vein on either drift, which is more than 140 feet south of the line of break, is at station 343, where it is encountered by a crosscut from station 341.

The conditions in No. 3½ tunnel are important, not only because of their complexity, but because that level south of station 99 is cut longitudinally by the side line between the two properties, and because the horizontal portion of the line of cut-off, if there be one, lies near, or only a few feet below, the floor of this level. The rock both north and south of station 118 is much disturbed. This would be so whether the National vein were severed or merely bent at this point. Probably the movement of a single bent hanging wall, down and over a hip in the foot wall, would be productive of more disturbance and dislocation than two independent movements separated by a long interval of time, each on a comparatively regular strike, one cutting through the other.

Coming from the north the drift widens at station 97. Its east wall swings more to the east, and the vein of quartz turns somewhat to the west. Twenty-eight feet south it is 13 or 14 feet wide; its roof is partly supported for the next 40 feet by three pillars, standing a little nearer the east than the west wall. Between stations 99 and 118, the drift is 20 feet wide; 76 feet south of station 97 it is 15½ feet wide; here the drift forks, or rather the passages on each side of the pillars, are continued to the south, each in a distinct drift. Between stations 99 and 118 the drift makes an elbow; to the north its course is about north 9° west; to the south, south 28° to 32° east. The east drift follows a fissure containing quartz, for a distance of 138 feet, to station 169. Its foot wall coming north extends to a point some 10 feet east of station 98; back of this are two walls, one of which reaches as far north as station 97. These walls, with the fissure in the east drift, according to defendant, are the east strand of the fault. The west drift extends south from station 118 to and through station 101, a distance of 88 feet. The main fault fissure, which comes north through this drift, goes to station 118 on a strike of north 28° west. A few feet north of that station it swings to the west, and at station 357, 82 feet from station 118, its strike is north 66° west. The quartz coming from the north grows stronger as the drift widens. At station 98 it is 6 feet thick; 10 or 12 feet further, between pillars A and B, it is 10 or 12 feet thick. Here the main body of quartz gradually

changes its course from south 9° east to south 15° east, and then to south 32° east. At this point a smaller strand of quartz, perhaps 3 or 4 feet thick, putting out from the main vein, continues on to station 118, where it terminates. Twenty-six feet south of station 98, the main strand of quartz divides; one fork 15 feet in length goes to a point about 8 feet east of station 100, where in the roof, midway between the two sides of the drift, it butts against and terminates on the west fissure coming out of the west drift. This fissure between its hanging wall and the line of contact with the quartz is perhaps 4 feet thick; it carries crushed rock, clay, fragments and stringers of quartz, and on the hanging wall there is the characteristic tough, black gouge of the fault, from 2 to 6 inches thick. At the line of contact between the quartz and the fault, small round fragments of rock are found, which indicate at least a differential movement. The severed band of quartz has a total width of from 1½ to 2 feet; its dip is 73° west. Corresponding dips on the opposite walls of the drift are 60° west on the foot wall, and 44° west on the hanging wall. The foot wall south of the south end of pillar B, where the main body of quartz forks, has a dip of 63° west; the corresponding strikes are north 10° east for the severed quartz strand, north 40° west for the east foot wall, and north 28° west for the west hanging wall. The severed strand of quartz is not parallel, either as to strike or dip, with any other wall, seam, or fissure in the drift, either to the east or the west; furthermore, nothing is cut with the quartz which resembles the hanging or the foot wall of the National vein. The material severed with it is simply vein matter.

Defendant contends that the severed vein is the main National fissure, and that the quartz on the east wall of the drift is a part of, and belongs to, the fault system. To this I am unable to yield my assent. A careful examination convinces me that the fissure of massive, heavy quartz, coming through stations 97 and 98, continues on without a break into the east drift, through stations 120 and 119, and that the fissure there exposed is the National vein. The severed strand is a cross-seam, which may reasonably be expected in any fissure at places where the fissure greatly exceeds its normal width. The same also is true of the quartz strand terminating at station 118.

"A vein which suddenly widens and narrows will exhibit bends which do not correspond with the walls of the vein itself."

I am unable to find any difference between the quartz at station 120 and the quartz further north. If there is more sugar quartz, it is due to greater internal movement within the fissure since the quartz was deposited. Second-grade ore has been taken from this vein near crosscut No. 8, more than 50 feet south of where the main trunk of quartz forks. Free gold, and even high-grade, has been found in the face of this drift at station 169. Above this level stoping has been done to a limited amount, for more than 180 feet to the south of the break. The fault movement is supposed to have brought down a basalt hanging wall, and the hanging wall of the fault is supposed to be basalt. The hanging wall of the east drift, however, is not basalt, but rhyolitic felsite; both walls of this drift, so far as defendant's evidence shows,

are in acid rock; so are both walls of the National vein. If, as Mr. Searls testifies, this fissure is a crack or ramification of the fault, there was here neither fracture nor movement prior to the creation of the main fault. Mr. Searls also testifies that it was so weak near station 97 it could not cut through the wall of the National vein. Ten feet east of station 98, where one of the walls of the east strand terminates in its course north, according to Prof. Lawson, there has not been sufficient movement to manufacture clay; the material there being merely decayed rock.

Notwithstanding all this, the east fissure is as wide as the main fissure. It is quite as wide as the drift; between stations 120 and 132, it is wider. There is as much evidence of movement here as there is in the National vein north of station 97. Mr. Searls speaks of it as the footwall branch which took up only a small portion of the movement. Mr. Lloyd suggests there is but one fault fissure, the hanging wall of which is in the west drift, the foot wall of which is in the east drift, and the country rock between the two is a lens-shaped horse. If this is true, there is a very remarkable situation on the 3½ level. From station 100, and for 72 feet north, the National vein is between the two strands of the fault; south of that station the space between the two strands is filled with a block of rhyolitic felsite, shaped like a half-worn cake of soap, thick in the center and tapering to a thin edge at the ends and sides; the east strand of the fault hugs the east or lower side of the horse, until it unites above and below the 3½ level with the west or main fault strand. Unquestionably the two strands do unite on their upward course, the dip of the west strand is flatter than the dip of the east strand; thus the two strands show a tendency to converge going up, and to diverge going down.

In the stopes above, the two strands are much closer together than at the floor of the drift itself. Below the level there are no workings which show a curvature of the east strand toward the main fissure, and neither on Mammoth No. 3 nor on No. 4 level does anything appear which bears witness to the existence of a fissure dipping from a possible stump of the National vein, and uniting with the west or main fault fissure.

In order to illustrate its conception of the situation, defendant has presented four cross-sections through this part of the workings. The first, A-A, is 197 feet south of station 118; on this section a horse is represented as extending from a point 20 feet vertically above the floor of No. 3 level to a point 38 feet vertically above the floor of Mammoth No. 3. This horse is 259 feet wide from top to bottom, and 14 feet thick at the 3½ level, where this latter dimension is greatest. The only exposure of any portion of the walls of the horse is in the 13 upraise from the east drift on the 3½ level; 25 feet up this raise, a crosscut to the west, some 12 feet in length, at its face cuts the same fissure which is exposed in the west drift. The dips taken on this section were 46½° west at tunnel No. 2, 59° west at tunnel No. 3, 55° west at a point 20.9 feet above the 3½ level, 41° west in the west drift on Mammoth No. 3, and 60° west, projected, for the east drift.

The next section, B-B, is 132 feet south of station 118. The only

exposures of the walls of the horse on this section are at No. 3 tunnel, and at a point 28.9 feet above the 3½ level, in the 12½ upraise. The horse is represented as being 281 feet wide and 13 feet thick at the 3½ level. The dip at the top of 12½ upraise is 61° west; at No. 3 tunnel, 60° west; at the west strand of Mammoth No. 3, 48° west; and on the east strand the projected dip at that level is 60° west.

Cross-section C-C is taken 130 feet south of station 118. The only exposures of the walls of the horse in this section are in No. 12 upraise, and at the No. 3 tunnel. The horse is represented as being 284 feet wide and 19 feet thick. The observed dips are: Foot wall at No. 3, 66° west; in the No. 12 upraise, 25 feet vertically above the floor of the 3½ level, 54° west; on the west drift Mammoth No. 3, 50° west; and in Mammoth No. 4 tunnel, 61° west.

The last cross-section, D-D, is drawn 104 feet south of station 118, near station 132, and passes very near the Workman Raise. The only exposures of the walls of the horse are in the No. 3 tunnel, and in the west drift of 3½ level. The horse is represented as being 252 feet wide and 26 feet thick. 51 feet south of station 118, crosscut No. 8 connects the two strands, which are there but 15 feet apart. At station 118 the foot wall of the east strand and the hanging wall of the west strand are 15½ feet apart; and at station 97 the north end of the foot wall of the west strand strikes north 5° west, while the main fault, more than 85 feet to the west at station 357, has a strike of north 66° west.

The idea of a lens-shaped horse derives its chief support from the variation in the dips of the fissure above the 3½ level, in tunnel No. 4, and in the two drifts on Mammoth No. 3. Defendant contends that the dips recited are tangent to the curve made by the vein in its downward course.

On section A-A, the dips, beginning at the No. 2 tunnel, are 46½°, 59°, 55°, and 60° projected in the east drift, and 40° in the west drift of Mammoth No. 3.

On section C-C the corresponding dips are 48°, 66°, 54°, 61°, and 50°. The dips given on complainant's Exhibit B and the exhibits displaying various cross-sections through the mine, show that a line drawn to conform to the dips at and above the 3½ level and on Mammoth No. 3 east level would not be an unusual profile.

As the vein goes downward, near the surface the dip is relatively flat; near 3 or 3½ level it becomes steeper; and still lower down it becomes flatter. For instance, on defendant's cross-section through the Stall shaft, Exhibit 112, dips corresponding to those just given are about as follows: 54°, 56°, 78°, 56½°; and below the 4¼ level, 68° and 57½°. The existence of such a dip or concavity is insufficient to establish defendant's contention. Furthermore, as the east strand of the fault descends below the 3½ level, it must unite with the west or main strand, or it must pursue an independent course between that strand and the National vein disclosed in the Workman Raise; if it does neither, no other conclusion is tenable but that it is the same fissure which comes up the Workman Raise, and, if so, the apex level, tunnel No. 2, tunnel No. 3, tunnel No. 4, Mammoth No. 2, the east

drift on the 3½ level, and the east drift on Mammoth No. 3 are all on the National vein, and there is no underground apex of that vein within defendant's boundary lines. That it has not pursued an independent course is certain, because no trace of such a fissure is anywhere found in the crosscut between the east and west drifts of Mammoth No. 3, 133 feet below; that it could have died out before reaching the crosscut is highly improbable in view of the evidences of movement between stations 120 and 169 on the 3½ level east drift.

Wherever in these workings there are two parallel fissures, the dip of the west fissure as a rule is flatter than the dip of the east fissure; they converge toward the surface, they diverge toward the deep; no working in the mine has shown any convergence which would justify a finding that the east and west fissures on the 3½ level unite within the 133 feet of vertical space which separates that level from Mammoth No. 3.

According to defendant, wherever the National vein or its spurs or cross-seams are cut on this level, or in the stopes above it, the cutting is effected by the west strand of the fault. For more than 72 feet north of station 100 we have the National vein exposed between the two fissures of the fault. 108 feet south of station 118, at the top of the Workman Raise, the National vein is not between the two fissures, but east of both of them. A few feet above that raise, it is said to be cut off, not by the main fault, but by the weaker or east strand of the fault. For 100 feet or more south of the Workman Raise the upcoming National vein is represented in defendant's cross-sections A-A, B-B, C-C, and D-D, as butting against, and being cut off by the east strand of the fault. Crosscut 8 connects the two strands of the fault within 55 feet south of station 118. There is no testimony that any trace of the National vein has been discovered in the rhyolitic felsite through which that crosscut is run. No explanation has been offered as to why the National vein north of station 100 is west and south of crosscut 8, is east of the back strand of the fault, or how it came to be so, or how and where it passes through that branch of the fault. If the east or back strand of the fault was strong enough to go down any considerable distance, it must have encountered the National vein below the floor of the level for about 70 feet north of station 100. If it be said that the plane of movement was along the hanging wall of the west strand, and that the movement on the east strand was not strong enough to carry this fragment of the National vein to the deep, then the question arises as to what has become of the corresponding fragment of the National vein south of station 100. There the plane of greatest movement was likewise on the west strand.

Observed local dips are dependent on local conditions. In the very nature of things they cannot, unless very numerous and everywhere taken, reflect accurately the general dip of a fissure. Furthermore, levels 4½, 4¾, and 5, north of the break, are lower than any workings to the south of that line, and should not be considered in comparing the dip of the fault with the dip of the vein. The dips of the fault, taken from the apex level at right angles to the strike of the fault,

and the dips of the vein taken from station 575 at right angles to the strike of the National vein, are as follows: North of the break to No. 2 level, 54°; south, 53°; north to No. 3 level, 53° or 54°; south, 51°; north to 3½ level, 55°; south to the east drift, 53°, to the west drift, 50°; north to No. 4 level, 60°; south, 53°; north to 4¼ level, 60°; south to Mammoth No. 3, west, 44°; to Mammoth No. 3, east, 54°.

The southwest corner of the West Virginia is 125 feet higher than the southeast corner, and 350 feet higher than the north end of that claim. The fissure or fissures in question dip under and into the mountain, while their course to the north is down a steep slope. This fact, as well as the difference in the material of the lower slopes of the mountain, may be responsible in some measure for the alleged steeper dip of the vein. The general tendency of the local dips observed on each level is to become steeper toward the north.

That portion of Mammoth No. 3 east, which is on the vein, is about 16 feet higher than No. 4¼ level. Dips taken on those two levels, two from the fault drift, one from station 575, and one from level No. 2, at intervals of about 200 feet, beginning at the south face, are as follows: At station 343, 53°; at station 304, 54°; at station 575, 60°; and at station 477, 62°.

It is evident on the most casual examination of the maps and models in evidence that the National vein south of the line of break in tunnel No. 4 and Mammoth No. 3 west drift is substantially parallel to the fault. The difference between its strike north and its strike south of the break in those tunnels is practically the same as the difference between the strike of the fault south and the strike of the National vein north of that line. If the two drifts on Mammoth No. 3 are projected upward, each at an angle equivalent to the average of its observed dips as shown on complainant's Exhibit B, the west or fault drift from station 322 to station 341 will fall 22 feet east, and the National or east vein between stations 172 and 343 will fall 19 feet west of the apex level.

On the south side of the break in the apex level from face to face, about 420 feet; in tunnel No. 2 from station 142 to station 181, 420 feet; in tunnel No. 3 from station 146 to station 177, 266 feet—the strike of the fault is approximately north 25° west. In tunnel No. 4 from station 115 to the face, 125 feet, the strike of the National vein is north 24½° west. In Mammoth No. 3 east drift from station 172 to station 343, a distance of 193 feet, the strike of the National vein is north 25½° west. In the 3½ level east drift, the strike of the fault is north 32° west; on the west drift, north 28° west. In Mammoth No. 3 tunnel west drift, from station 322 to station 341, 220 feet, the strike of the fault is north 31½° west. The corresponding strikes of the National vein north of the break are from due north and south to north 5° west.

Under all the circumstances, the difference in strike, and the difference between the dip of the fault north of the break and the dip of the National vein south of that line, are not very persuasive evidence that the vein and fault are distinct, independent fissures.

It is conceded that level 4 throughout its entire length, and Mam-

mouth 3 east from station 301 to station 174, and again at station 343, are entirely on the National vein; otherwise it is claimed by defendant that all the drifts south of the break are in the fault fissure. The theory of the defense is that the National vein, coming up under the fault, is cut off above the Workman Raise before it reaches the vertical plane passing through complainant's west side line. In tunnel No. 4 and Mammoth No. 3 east are the only conceded exposures of the National vein south of the break. If defendant's theory is correct, the vein south of the break in No. 4 and Mammoth No. 3 east should exhibit the characteristics of the National vein, and should differ from the fault as the vein does. This, however, is not the case. The fissure in No. 4 and Mammoth No. 3 east, near the line of break, changes its course from almost due north and south, and thereafter is parallel to the fault drifts above. The similarity of the bends in the fissure on the No. 4 level and in 3½ east is more than suggestive of their identity.

North of the break from level 1 to level 5, the stoping for several hundred feet is practically continuous. South of that line there is very little. Between tunnels 1 and 2, it extends 40 feet south of the break; between tunnels 2 and 3 the area stoped is irregular, at the furthest point it is 80 feet south of the break. Between 3 and 3½ levels, 180 feet south of the break, there is a little stoping. On the National vein in No. 4 and Mammoth No. 3 east, however, there is no stoping whatever, and no history of the extraction of any valuable ore. It is said that 90 per cent. of the contents of the National vein and but 10 per cent. of the fault is quartz. This is probably true. It is also true that little more than 10 per cent. of the contents of the National vein in No. 4 and Mammoth No. 3 east, south of the break, is quartz. It is claimed that the National vein contains very little clay and gouge, while these materials constitute a very large portion of the filling of the fault. This is true, except in No. 4 and Mammoth No. 3 east, south of the break. A great body of massive quartz coming from the north in No. 4 at about station 115 is cut out by a seam of clay coming from the northwest across crosscut No. 9 and the line of break. This clay in the National vein is one of the largest exposures of clay in the mine; it nearly fills the drift, and continues to the Workman Raise, where the quartz comes in again. This is very much like what happens in the fault levels above. South of the break for some distance there is sugar quartz, crushed rock, and gouge; then there is a space barren of quartz; while farther south the quartz comes in again. At the south end of the apex level there is 80 feet of quartz from 6 to 12 inches thick. In the No. 2 level south of station 179, there is 60 feet of quartz, from 18 inches to 2 feet thick. The mineralization commences 300 feet south of station 142. In No. 3 tunnel the quartz begins at station 167, 175 feet south of the break. In both drifts on the 3½ level there is a very noticeable diminution in the quantity of quartz as the line of break is crossed going south.

The tough, leathery, black gouge, which is claimed to be one of the most characteristic features of the fault, is not found in the National vein north of the break. The fact that the gouge to the south is much darker than the gouge and clay to the north is probably due to the

more abundant basalt at the south end of the West Virginia. This characteristic tough black gouge, however, is found in the National vein in tunnel No. 4 south of the break. Calcite, which is present in the fault, has not been discovered in the National vein north of the break; but there is an abundance of it at station 343, Mammoth No. 3 east. It is true that galena and sphalerite have been discovered in the National vein, but not in the fault. Where found, these metals occur in minute crystals, almost invisible to the naked eye. It is very possible that a more careful and systematic search might reveal these metals in the fault.

It is unnecessary to pursue in further detail the evidence which is claimed to distinguish the fault from the vein. I am unable to discover wherein the National vein in No. 4 and Mammoth No. 3 east, south of the break, differs materially from the so-called fault fissure, either as to strike, dip, filling, or mineralization. I therefore find that the fault and the vein are parts of one and the same fissure. The distinctions which have been called to my attention are due to causes, forces, and conditions which have been present at one end of this fissure, but not at the other, or which have differed in efficiency as they were applied north or south of the bend.

Let a decree be entered in favor of complainant.